Filed 8/13/20  In re S.S. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re S.S., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>A.S.,<br>        Defendant and Appellant. | A158227<br><br>(Contra Costa County Super. Ct. No. J19-00151) |

A.S. (Mother), mother of seven-year-old S.S., appeals from the juvenile court's dispositional order removing S.S. from her care.[1]  Contra Costa County Children and Family Services Bureau (the Bureau) has moved to dismiss the appeal as moot since S.S. has been returned to Mother's care or, in the alternative, moves to dismiss the appeal on its merits.  We deny the Bureau's motion to dismiss and affirm the dispositional order.

---

[1]     S.S.'s father, B.P. (Father), is not a party to this appeal.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On February 13, 2019,[2] the Bureau filed a dependency petition alleging S.S. was at substantial risk of harm in Mother's care based on Mother's history of substance abuse, mental health issues, and domestic violence and assaultive behavior in S.S.'s presence; in addition, Mother had a recent arrest for assault while under the influence.

A February 14 detention/jurisdiction report stated Mother was arrested in October 2018 for domestic battery after she punched and scratched her boyfriend and grabbed his neck. On February 2, Mother's mother (Grandmother) called the police to report that Mother was fighting with someone in their apartment parking lot. When police arrived, Mother was yelling and crying hysterically while holding S.S., who was also crying. Mother refused the officer's request to get up and whispered something in S.S.'s ear, causing her to cry again. When Mother finally stood up, she stumbled. Her eyes were bloodshot and watery and she smelled of alcohol. Concerned for S.S.'s safety, the officers asked Mother to put S.S. down and leave her with Grandmother, but Mother refused and a struggle ensued, with Mother using S.S. "as a human shield" as officers tried to handcuff her. Mother ultimately handed S.S. to Grandmother and was arrested.

Mother admitted she took S.S. with her to a party that evening and drank alcohol. After returning home, and in S.S.'s presence, Mother and a neighbor got into an argument, the neighbor took Mother's phone, and the two "hit each other several times." Grandmother was concerned for S.S.'s safety because Mother placed S.S. in dangerous situations by taking her to parties, getting "extremely intoxicated," meeting "numerous men," and leaving S.S. with strangers.

---

[2]     Unless otherwise noted, all further dates are in 2019.

2

Later, while Mother was in custody, she tried to strangle herself with her hands. An officer heard Mother struggling to breathe and yelled at her to stop. Mother did not stop, and shoved her hand down her mouth, screamed at the officer, made irrational statements, and said she "wanted to die." Mother was transported to the hospital for a psychiatric evaluation under Welfare and Institutions Code section 5150 (5150 hold).

The next day, Mother returned to the police department to report she might have been raped at the party. She realized after returning home from the hospital that she was not wearing underwear and could " 'feel' that she had sexual intercourse" but knew she had not given consent. She did not remember much about the party, other than that she "blacked out" and there was a " 'scruffy/disgusting' guy" and a " 'circle dance.' " Officers interviewed Y.Y., who drove Mother and S.S. home from the party after she saw Mother drinking a lot and talking to and dancing with married men. Y.Y. believed Mother developed a "drinking problem" after breaking up with her boyfriend.

Social workers met with Mother on February 4 to discuss the recent events as well as Mother's child welfare history, which included three unfounded referrals for general neglect and physical abuse of S.S. between 2015 and 2017. Mother said she went to the party with S.S. because her friend, who knew Mother was " 'depressed' " about a relationship that ended in December 2018, encouraged her to go out. Almost everyone at the party was drunk. Mother drank and "blacked out" because she took Percocet for the first time that morning and mixed it with alcohol. When asked whether she was raped, Mother said it was the police's job to "figure [it] out." She denied trying to strangle herself while in custody and claimed she was placed on a 5150 hold for refusing to take her shoes and jewelry off and asking to speak to a supervisor. She admitted she was previously placed on a 5150

3

hold when her abusive ex-boyfriend posted nude pictures of her online, which made her "want[] to die."

Grandmother told social workers that she cared for S.S. for three years while Mother lived out of state. Mother returned two years ago and was " 'violent,' " did not consistently take S.S. to school, fed her mostly snacks, and treated her "so bad" by getting " ' so crazy' " screaming at S.S. and hitting her. A neighbor saw Mother smash S.S.'s head on the ground with her foot, and Grandmother had seen bruises and marks on S.S. Mother also had her ex-boyfriend take nude photographs of her in S.S.'s presence. Grandmother said, " 'I am just concerned about the baby, [Mother] is mental. If she does not do anything for her mental health the baby is going to die.' " Social workers also spoke briefly to S.S., who said she saw Mother fighting " 'in the streets.' " When asked what she and Mother did for fun, S.S. responded, " 'nothing.' "

At a Family Team meeting, Mother told social workers that she stopped taking her antidepressant medication because it made her sleepy but she was ready to seek mental health treatment. Social workers observed the "dysfunctional dynamics" between Mother and Grandmother, as they frequently interrupted each other and argued. The Bureau recommended detaining S.S. as Mother had mental health issues, did not take responsibility for her actions, and did not believe drinking was problematic. While Grandmother was sometimes "a protective factor," she and Mother had an unhealthy relationship and argued about inappropriate topics in front of S.S.

At a February 14 detention hearing, the juvenile court ordered S.S. detained from Mother and ordered visitation. Thereafter, the court took jurisdiction based on language agreed to by Mother at mediation. In an April

4

11 dispositional report, the Bureau recommended that S.S. be removed from Mother's care, with reunification services, as Mother's mental health issues, alcohol use, involvement in unhealthy and violent relationships, and inability to prioritize S.S.'s safety placed S.S. at risk of harm. Mother had drug tested only three times out of eight and had one positive test for codeine, for which she had a prescription. She claimed she attended Alcoholics Anonymous (AA) meetings but provided no documentation and did not sign a release for the Bureau. Mother said she felt she was being punished for one incident that occurred after she took a pain pill.

Visits between Mother and S.S. were overall appropriate, but there were some concerns. During one visit, S.S. told Mother that she is "mean" and hits S.S. " 'like every day.' " S.S. cried inconsolably for a while, and when Mother asked her why she was crying, S.S. responded, " 'because you are mean to me.' " Mother called the social worker on the day of the next visit to cancel, stating she had gotten into an argument with Grandmother and had "a lot of things to sort out."

At an April 11 dispositional hearing, Father made his first appearance and was referred to an attorney. Mother asked to represent herself (*People v. Marsden* (1970) 2 Cal.3d 118), and the juvenile court denied her request. Mother's counsel asked for expanded visits, stating Mother was participating in services and an alcohol assessment had "recommended no treatment." The court questioned Mother's judgment and had "real concerns about what [S.S.] was exposed to on [Mother's] watch," but increased visits from once to twice per week, with discretion to the Bureau to make them unsupervised.

In a May 9 memo, a social worker summarized contacts had with Father.[3] Mother had started attending parenting and anger management classes but had only drug tested once out of eight times. In addition, she questioned S.S. about her visit with Father, asked whether she felt safe with " 'that man,' " and said S.S. should not be forced to have contact with " 'that sperm donor.' " The visitation supervisor reminded Mother not to speak negatively about Father and told her to wait to discuss Father's visits, but Mother pressed on until the visitation supervisor threatened to cancel the visit. The Bureau was concerned that Mother, who became aware that Father might seek custody and support, told S.S.'s therapist that she (Mother) has dual citizenship and was going to " 'kidnap' " S.S. and leave the country.

According to a June 20 memo, Mother said she was going to obtain a restraining order against Father for "harassing her." Father, however, was adamant that he had not contacted Mother for several weeks since the social worker had directed him not to. Mother did not file a request for a restraining order. The following week, Mother said she had an "emergency"; she was " 'done with her reunification' " and ready to "sign away her rights to her child" because the case plan required her to do more than Father, which was unfair.

At a June 20 and 24 contested dispositional hearing, Mother testified she moved to a safe community and was working full time, participated in parenting and anger management classes, therapy, and AA, and was

---

[3]    Father was working two jobs, had two older children, good family support, and no criminal background. He felt S.S. would be safe and happy living with him. Father's first visit with S.S. went well, with S.S. jumping into Father's arms and the two playing well together and showing affection towards each other throughout the visit.

repairing her relationship with Grandmother.  She completed two alcohol assessments and no further treatment was recommended.  Regarding her mental health, Mother believed her stress was coming from lack of sleep; she was now taking sleeping pills and was feeling better.  She believed the most recent 5150 hold helped her understand that she was having a reaction to her medication; she noted the doctor released her from the hold after just 35 minutes.

Mother testified about the educational services she obtained for S.S. and said she wished to remain involved in the educational and medical decision-making process.  She expressed concern about S.S.'s privacy rights, stating she saw Facebook posts in which the foster parents posted S.S.'s pictures and name and identified her as a foster child.  She was also concerned whether S.S. was safe in foster care.  Mother acknowledged she has dual citizenship but denied saying she was going to kidnap S.S.

On cross-examination, Mother admitted an anger management problem and that she punched her neighbor in the face in S.S.'s presence.  She was previously in an abusive relationship and she and S.S. moved in with the man even though he was violent with her.  She denied abusing alcohol and said she behaved the way she did on February 2 because she mixed pain medication with "about" four shots of tequila and one beer.  When confronted with her failure to drug test, Mother said she did not know she had to test and was also unable to test due to long work hours.  She received testing instructions, forms, and testing site information but, "I just maybe assumed that since all my tests have come out negative, that they are not a priority."

When minor's counsel asked Mother whether her babysitter's godson drove her home from the party, Mother responded, "Her godson is four years

old.  I would like to know how a 4-year-old can drive a car."  She denied ever saying she "blacked out" and refused to answer questions about her rape allegations based on "the Fifth [Amendment]."  She did not know why she was arrested that night: "I actually never really asked. I was not charged, so I honestly don't care."  She denied trying to harm herself while in custody and said she put her arms around her neck "to remove the extremely heavy shirt [she] was wearing."  She did not stop when the officer told her to because the shirt was "extremely tight and uncomfortable."  "Most women's clothing becomes uncomfortable after a[] while."  When asked about her shoving her hand down her throat, Mother smiled, referred to counsel's questions as "ridiculous," and said she did it to induce throwing up.  She denied saying she wanted to die, and added, "People choose to write whatever they want in their reports."

Mother had taken four anger management classes as of the date of the hearing and believed she was now able to control her anger.  On further cross-examination by the Bureau's attorney, she admitted the police also came to her home on March 4, when she and Grandmother got into a fight.  She denied throwing a bottle of lotion at Grandmother and said she did not know why Grandmother's boyfriend—who was present during the argument—would say she did.  Mother and Grandmother were in therapy to address their issues.  Mother then asked the Bureau's attorney, "Would you like to bring any more of my private matters up?"  Counsel asked, "Do you understand that your reactions and your behaviors are why we're here today?"  Mother responded, "Yes.  Do you understand that people have lives, and that they are private[?] I want to know how this is relevant to my child's care."  "My child was not present at that time."  "My child has not been present since February 13th."

The Bureau's attorney asked Mother about Grandmother's prior statement to the Bureau that Mother left S.S. with Grandmother for three years. Mother said this was not true as she was gone for only two months when she went to Mardi Gras to work as a stripper. Mother noted that stripping is legal, and said she used to be an "extremely happy 18-year-old" working as a stripper in a strip club in San Francisco at the time she met Father, who was a manager at the club.

During closing arguments, Mother's counsel argued Mother took responsibility for her actions "very early on in these proceedings" and had made significant progress in her case plan. Counsel argued it would be safe for S.S. to return to Mother's care, as Mother was "ready, willing, and able" to complete all recommended services. The Bureau's attorney argued it was "clear" during Mother's testimony that she was saying "what she wants us to hear," which is "not necessarily the truth," nor "complete," and that she has "a lot more work to do" before S.S. can be safely placed in her care. Counsel pointed to inconsistencies in Mother's testimony, asserted Mother often "challenges" or "deflect[s]," and noted she has had "outbursts here in court," "poor impulse control," and "underlying anger issues." Minor's counsel agreed and added that Mother minimized her actions, was "constantly" evasive," and "had absolutely no credibility in anything she said." The "belligerence" in Mother's "facial expressions [as she answered] questions," her "smug self-righteous air," and "gloating type of facial response" showed she had "absolutely no insight as to what's going on."

The juvenile court stated Mother's behavior on the stand was "astonishing"; she was "belligerent," "inconsistent," "minimized," "argued," "demonstrated that she has little impulse control," "[v]ery little ability to tell a consistent story, and therefore, very little credibility in the end." A number

9

of things such as her testimony regarding drug tests "were clearly not true because she contradicted [herself]." The court had no doubt that Mother loves S.S., but stated she lacks perspective and insight "as to what a horrific event this was for [S.S.]." As the court stated its findings, Mother interrupted repeatedly, which the court referred to as examples of "a lack of impulse control." "I'm trying to make a ruling, I'm trying to make findings, and [Mother] is yelling at me about what [the] facts are, and talking about what witnesses she wants to bring in, including her daughter." The court was "very, very concerned" for the child and also concerned for Mother, who "has some real anger management issues. I think [Mother] has some mental health issues. I think she . . . probably has some substance abuse issues." Mother continued to interrupt until the court ultimately stated it was finding, "by clear and convincing evidence that having [S.S.] in her mother's care at this time would . . . expose her to a real risk of physical or emotional harm, and there's no reason or means by which her physical health can be protected without removing her from her mother's physical custody." Mother appeals from the dispositional order removing S.S. from her care.

## DISCUSSION

### I. Motion to Dismiss

The Bureau has moved to dismiss Mother's appeal based on mootness as S.S. has been returned to Mother's care. The Bureau asks that we take judicial notice of a June 4, 2020 stipulation and order returning S.S. to Mother's care with family maintenance services. Mother argues the issues are not moot and, even if they are, this court should exercise its inherent authority to decide the merits of the controversy. We grant the request for judicial notice, deny the motion to dismiss, and affirm the dispositional order on the merits.

10

"As a general rule, 'an appeal presenting only abstract or academic questions is subject to dismissal as moot.' [Citation.]" (*In re Jody R.* (1990) 218 Cal.App.3d 1615, 1621.)  However, even in circumstances where effective relief can no longer be provided because the parent has since been awarded custody, courts have recognized they retain the inherent discretion to resolve the issue " where 'there is a likelihood of recurrence of the controversy between the same parties or others.' " (*In re N.S.* (2016) 245 Cal.App.4th 53, 59.)  For example, appellate courts have declined to dismiss appeals as moot where dependency jurisdiction has ended but the juvenile court's orders continue to affect the parents' custody and visitation rights. (*E.g., In re Joshua A.* (1994) 24 Cal.App.4th 1544, 1546-1547 [juvenile court's adverse rulings continued to affect the parent's custody and visitation rights]; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1431-1432 [same].)

*In re Michael D.* (1996) 51 Cal.App.4th 1074 is instructive.  There, while the mother's appeal from a removal order was pending, the juvenile court issued an order permitting the child to continue residing with her.  (*Id.* at p. 1081, fn. 2.)  The Court of Appeal declined to dismiss the appeal as moot, stating the juvenile court "continues to retain jurisdiction of the matter.  Consequently, resolution of the issue raised in this appeal is particularly appropriate because it is likely to affect the future rights of the parties." (*Ibid.*)

Similarly, although the recent order returns S.S. to Mother's care, the juvenile court continues to have jurisdiction over the matter.  S.S. is still a dependent child, Mother is receiving family maintenance services under the supervision of the Bureau, and there is an upcoming review hearing.  The order includes visitation orders for Father, who is also a party to the action, and there is some indication in the record that he wishes to seek further

visitation and/or custody of S.S.  Because the issues raised in this appeal have a continuing effect on Mother in the dependency proceedings and on her custody and visitation rights, we decline to dismiss the appeal as moot.

## II. Substantial Evidence

The appeal fails on the merits.

When a minor has been adjudged a dependent child of the court under Welfare and Institutions Code section 300,[4] the juvenile court may limit the control to be exercised over the dependent child by the parent or guardian. (§ 361, subd. a).)  A dependent child may not be taken from the physical custody of his parent unless the juvenile court finds by clear and convincing evidence that there is a "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected" without removal.  (§ 361, subd. (c)(1).) " ' "The parent need not be dangerous, and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child." ' [Citation.]  The court may consider a parent's past conduct as well as present circumstances." (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

The California Supreme Court recently clarified the standard for appellate courts to use when reviewing findings—such as the removal-related findings in this case—that must be proved by clear and convincing evidence. In such cases, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true.  In conducting its

---

[4]     All further undesignated statutory references are to the Welfare and Institutions Code.

12

review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (Jul. 27, 2020) --- P.3d ----2020 WL 4280960, at p. *12.)  The appellant has the burden of showing there is insufficient evidence to support the juvenile court's findings or orders.  (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

　　We conclude the record contains sufficient evidence from which the juvenile court could have found it highly probable that there was "substantial danger to [S.S.'s] physical health, safety, protection, or physical or emotional well-being . . . if [she] were returned" to Mother's care, and that there were "no reasonable means" by which she could be protected without removal. (§ 361, subd. (c)(1).)  At the time of the dispositional hearings, Mother had been placed on two 5150 holds and arrested twice for engaging in violent behavior, including at least once in S.S.'s presence.  She was recently in an abusive relationship, and despite the fact that the man had been violent with her, she and S.S. had moved in with him.  Throughout the proceedings, Mother minimized the February 2 incident, stating, among other things, that she was being punished for one event that happened after she took pain medication.  She denied trying to strangle herself while in custody, claiming she was simply trying to take an uncomfortable shirt off, and asserted she was unjustly arrested and placed on a 5150 hold.  Further, even after S.S. was detained, Mother was involved in another fight—with Grandmother— that required police intervention.  Moreover, Mother's testimony, as well as her attitude while on the stand—of which the Bureau's attorney, minor's counsel, and the juvenile court all took note—showed she did not appreciate

13

the gravity of the situation or the effect her behavior had on her child. (*In re Margarita D.* (1999) 72 Cal.App.4th 1288, 1295-1296 [the trial court, "which had the opportunity to observe the witness testify, is better suited than a reviewing court to make such determinations of fact].)

While Mother was actively engaged in services, she had been participating for only a month or two at the time of disposition and had not obtained certificates of completion. She asserted the anger management classes were helping her control her anger, but she continued to have outbursts in court and was unable to stop interrupting counsel or the court after multiple warnings. Mother also asserts she had positive and loving visits with S.S., but the record shows otherwise, e.g., Mother questioning S.S. about her visits with Father and continuing to speak negatively about him after being instructed to stop, and S.S. crying inconsolably and saying that Mother is mean to her and hits her everyday.

Reviewing the evidence in the light most favorable to the juvenile court's decision, we conclude there was substantial evidence to support the removal order.

## DISPOSITION

The Bureau's request for judicial notice is granted. The Bureau's motion to dismiss is denied. The juvenile court's June 24, 2019 dispositional order removing S.S. from Mother's care is affirmed.

14

_____
Petrou, J.

WE CONCUR:


_____
Siggins, P.J.


_____
Fujisaki, J.


*A158227*